Filed 5/24/23  In re Jonathan N. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re JONATHAN N. et al., Persons Coming Under the Juvenile Court Law. | B319063 (Los Angeles County Super. Ct. Nos. 19CCJP05125, 19CCJP05125A, 19CCJP05125B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br> DIANA O., et al., <br><br> Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant Diana O.

Karen B. Stalter, under appointment by the Court of Appeal for Defendant and Appellant Jonathan N.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Children J., age two, and N., eight months, were detained from mother Diana O. (mother) and father Jonathan N.[1] (father) in August 2019 and placed with their maternal grandmother. Mother and father failed to reunify with the children, and reunification services were terminated in September 2021. In March 2022, under Welfare and Institutions Code section 366.26,[2] the juvenile court terminated parental rights over the parents' objection that the parental-benefit exception applies. The parents appealed.

We affirm. Although mother's visitation with the children was consistent and pleasant, she did not offer evidence showing that continuation of the relationship would benefit the children or that termination of her parental rights would be detrimental to the children. Father forfeited his claims by failing to argue below that the parental benefit exception applies to him, and he also failed to present sufficient evidence to support the parental-benefit exception.

---

[1] Father's name is also spelled "Jonathon" in parts of the record on appeal.
[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Initial proceedings

The children came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in June 2019, when J. was two years old and N. was seven months old.[3]  DCFS received a report that on June 9, father "was frustrated with child [J.] crying and punched the child once on the leg."  The report stated that father had been "physically aggressive" with mother, and mother suspected father was using drugs.

On June 20, 2019, a children's social worker (CSW) met with mother and the children at their home while father was out. Mother reported that father had punched J. on the leg because he was crying, but said it did not leave a bruise and father did not intend to cause harm.  Mother said it was an isolated incident, and father had never spanked J.  Mother also said that a couple of weeks earlier, father pulled on mother's arm during an argument.  Mother called law enforcement, who removed father from the home so he could cool off.  Mother said father had been under stress lately, and when he was not stressed, everything was fine.  Mother denied ongoing domestic violence.  The children had no visible marks or bruises, and appeared happy and comfortable in mother's presence.

The CSW met with father at the DCFS office the same day. Father denied that he punched J., saying instead that he "spanked" him while he was having a tantrum; the open-handed slap landed on J.'s ankle.  Father denied any domestic violence with mother.  He stated that in a recent incident, he and mother

---

[3]    There had been one previous referral for the family in May 2018, which was deemed unfounded.

were arguing. Mother blocked the door and refused to let him leave, so he moved mother by grabbing her arm and leg. Father stated that long hours from his previous job had caused relationship problems with mother; he had recently quit his job and he was unemployed. Father said that the children's maternal grandmother (MGM) interfered a lot with the children. Father was on parole; his parole agent said father had been doing well on his parole until about two months earlier, when he tested positive for methamphetamine and he and mother began having relationship problems. Father's drug test dated June 27 was positive for amphetamine, methamphetamine, and marijuana metabolites. DCFS found the family to be at high risk of future abuse or neglect, and stated that it was seeking court oversight to monitor the safety of the children.

On August 12, 2019, DCFS filed a petition under section 300, subdivisions (a), (b)(1), and (j). Counts a-1, b-1, and j-1 alleged that father physically abused J. by striking his leg, which was excessive, and that the physical abuse created an environment that endangered the safety of both children. Counts a-2 and b-2 alleged that father and mother engaged in a violent physical altercation in which father pulled mother's arm, and the violent conduct by father endangered the children's physical health and safety. Count b-3 alleged that father had a history of substance abuse and was a current user of amphetamine, methamphetamine, and marijuana, which interfered with father's ability to care for the children. Count b-3 further alleged that mother knew of father's substance abuse and failed to protect the children.

A last-minute information filed August 13 stated that on August 11, mother and father were involved in another domestic

4

violence incident in the presence of the children in which mother hit father. Mother had been arrested and she was in jail. DCFS recommended that the children be detained from both mother and father. The court ordered the children detained on August 13, 2019 and ordered reunification services for the family.

**B.    Adjudication**

A jurisdiction/disposition report filed August 30, 2019 stated that the children had been placed with MGM. The parents had not made themselves available to DCFS. Neither mother nor father had contacted DCFS to set up visitation with the children.

MGM reported that the family lived with her before the case began. MGM said that several times a week she heard father verbally abuse and possibly hit mother while they were in their bedroom; MGM tried to intervene but at times she was unable to enter the bedroom. MGM said that when she was able to, she would remove the children from the bedroom so they would not witness the domestic violence. MGM said she also heard father yell at and possibly spank J. MGM reported that she was able to care for the children, but J. cried at night because he wanted mother.

A last-minute information filed September 16, 2019 stated that DCFS had been able to contact mother. Mother denied the allegation that father hit J.'s leg, stating that father was attempting to spank J., but J. moved. Mother admitted that she and father "fight like cats and dogs," including pushing and pulling each other. Mother said she believed police had been called seven times, and she had been arrested once because she left marks on father. Mother's criminal case for spousal battery was pending. Mother said she was participating in parenting classes, and she had inquired about individual therapy. Mother

said she was willing to comply with court orders and cooperate with DCFS. Mother said she suspected father was using drugs, but father denied it when she asked.

A last-minute information filed October 8, 2019 stated that parents had both attended a team meeting on September 26 and were seen walking together afterward, even though there was a criminal protective order requiring mother to stay away from father and the CSW had spoken to both parents about the importance of complying with that order. Father still had not agreed to be interviewed about the allegations. The last-minute information did not describe any visits between the parents and children. Father had not provided information about the person he requested to monitor the visits. When the CSW offered to have visits monitored by MGM, father declined.

A last-minute information filed December 9, 2019 stated that father had not submitted to drug testing. Five drug test results from September 27 to November 26 stated that father was a no-show each time. Father had not visited the children, stating that his work schedule prevented visits. Father still had not spoken with the CSW about the allegations. Father had completed nine sessions of a parenting class.

Mother had completed 10 sessions of a parenting class, and she had started attending domestic violence classes. Mother had been visiting the children, and the visits were going well. Mother said she wanted to work on her relationship with father, but because the criminal protective order was still in place, they were not living together.

At the adjudication hearing December 9, 2019, the juvenile court sustained the petition as amended by interlineation; the amended petition is not in the record on appeal. The court's

6

minute order states that counts b-2 and b-3 were sustained as amended regarding mother and father; counts a-1, b-2, and j-1 were dismissed. The court declared the children dependents of the court under section 300, subdivision (b). The court ordered reunification services for the parents, and stated that mother's visitation with the children could be unmonitored within MGM's home, and monitored outside the home. Father's visits were to remain monitored.

## C.    Reunification period

A status review report filed May 12, 2020 stated that the children remained living with MGM and were doing well. J. had developmental delays and was receiving therapy.

A new incident had been reported to the child protection hotline on March 25, 2020. The reporter stated that father and mother lived together in paternal grandmother's (PGM's) home. On March 24, 2020 father slapped mother and punched PGM on the eye; father was arrested. When the CSW relayed this allegation to father, he initially denied it, but later said that following an argument with mother he was arrested for being under the influence of a controlled substance. Mother also denied the allegation, but the CSW stated that a "pertinent collateral" confirmed that the information in the report was accurate. Father's parole officer confirmed that father had been arrested in March.

Both parents maintained consistent visitation with the children; their visits were monitored by MGM, who reported no concerns. Mother had attended some medical and therapy visits for J. Mother had also completed parenting classes and was attending domestic violence classes, but she had not started individual counseling. Father was discharged from a substance

abuse program in March 2020 without completing it. Father had been arrested in March 2020 for being under the influence of a controlled substance. Father's drug test results from December 9, 2019 to April 29, 2020 had one negative test and nine no-shows.

An interim review report filed August 31, 2020 stated that MGM reported that the children continued having consistent visitation with their parents; MGM had no concerns. Mother continued to attend medical and therapy appointments for J. Mother maintained regular contact with the CSW, she had completed eight of ten domestic violence classes, and she had enrolled in individual counseling. Mother had monitored and unmonitored visits with the children, and no issues were reported. Father had "limited to no contact with [the] CSW." Father was not enrolled in a substance abuse program, he was not completing drug tests, he had been discharged from his domestic violence program for missing sessions, and he was about to be discharged from an anger management program for failing to participate.

The interim review report stated that father had the criminal protective order lifted, and mother and father now resided together. DCFS determined that the family was still at high risk for future abuse or neglect, and recommended ongoing reunification services. At the review hearing on September 9, 2020, the juvenile court ordered continuing reunification services, and set a date for a permanency planning hearing. (§ 366.21, subd. (f).)

A status review report filed February 17, 2021 stated that the children remained living with MGM and were doing well. Mother was consistent with her monitored and unmonitored

8

visitation, and she "interacts well with both children as she plays with them with their toys." Father was "semi-consistent" with visitation, and was "appropriate" during visitation. However, MGM reported that when mother and father visited the children together on December 29, 2020, they asked MGM what she does with the funding she receives from caring for the children. MGM replied that she had discussed the issue with the CSW and did not need to answer to them. Father "raised his voice and said he was going to do everything possible to have the children removed." The CSW informed mother and father that they could no longer visit together, and the visits would no longer occur at MGM's home. The court had ordered three visits per week for father; in January 2021, father had visited on the 8th, 15th, and 17th. Specific dates of other visits are not included in the report.

At the hearing on March 10, 2021, the court continued reunification services for the parents, and ordered an unmonitored 29-day visit for mother if DCFS confirmed that father had moved out. Father's visits were to remain monitored and separate from mother's visits. The court set an 18-month review hearing for September 9, 2021.

The extended visit with mother never occurred. Although it appeared that father had moved his belongings out of the room he and mother shared, the CSW was unsure he had actually vacated the apartment, and the CSW was unable to verify the names and dates of birth of mother's roommates. Mother said she was not willing to live with MGM.

A status review report filed August 16, 2021 stated that J., now age 4, and N., now age 2, remained living with MGM; they were healthy and thriving. J. was developmentally on track and no longer receiving therapy services. Mother and father were

9

"consistent" with visitation and MGM reported no concerns about the visits. During mother's visits, she played with the children, fed them, and watched television with them. During father's visits, he took them to a park or got food with them, and he "redirects them in an appropriate manner."

Father had been arrested on July 24, 2021 for cohabitant battery, possession of a controlled substance, and possession of unlawful paraphernalia. The status review report stated, "Per police report, the incident occurred at PGM's home with PGM, MGM, mother, father, [J.] and [N.] present. Father slapped mother on the right ear using his left hand while mother was sitting on the toilet due to their 'ongoing troubled relationship.'" Father was arrested, and police found a methamphetamine pipe and baggies containing what appeared to be methamphetamine. MGM confirmed the incident, stating that several family members were celebrating a birthday when father showed up and would not leave. MGM said the children were present, but they did not witness the incident. Mother told the CSW it was "a big misunderstanding" and "not a big deal." Mother said she lied to police about father hitting her, and she believed that father was sober. Father told the CSW that PGM forced mother to lie to police about the hitting incident, but he admitted the methamphetamine was his and that he continued to struggle with substance abuse.

Mother had been evicted from the room she was renting and she and father were living together in a hotel. DCFS recommended that the court terminate reunification services and set a section 366.26 hearing.

At the review hearing on September 9, 2021, the court terminated family reunification services, noting that the case was

10

more than two years old, and mother and father had not addressed the issues that led to jurisdiction. The court noted that with mother and father living together and the recent domestic violence incident, "we are at square one on everything, and cannot be at square one under California law two years later." The court set a section 366.26 hearing for January 11, 2022.

## D.    Termination of parental rights

The section 366.26 report filed December 17, 2021 stated that the children were living with MGM and doing well. J. was in kindergarten; his teacher noted that he was learning quickly and was well-behaved in class. MGM told the CSW that "since turning 5 years of age, [J.] has been asking why he is not going home to his mother. [MGM] states that it has become instinct to tell him that 'soon you will be,' but added, 'I don't know what to say to him.'" MGM also said that sometimes J. cries, and he is "questioning [his] life and his environment, such as why he is not going home with his mother." The CSW advised MGM to be honest with J. N. was developing well and had no issues.

MGM was the prospective adoptive parent and was "very motivated and committed [to] adopting the children." MGM was a stay-at-home parent in a clean and safe home; she had a "strong and positive attachment" to the children. MGM provided the children "all of the essential necessities in a nurturing and loving home environment." The children "wish to remain under the care and supervision" of MGM. DCFS found that it would be in the best interests of the children to be adopted by MGM, and recommended that the court terminate parental rights and proceed with adoption.

11

Mother continued to visit the children on her previous visitation schedule: Mondays, Wednesdays, and Fridays for six hours per day. The children were happy to see mother and would cry when she left. MGM reported that father had not visited the children for four months, but said he planned to resume visitation soon. MGM said she would no longer monitor father's visits, because father had yelled at her and been disrespectful. A paternal uncle was planning to monitor father's next visit.

At the section 366.26 hearing on January 11, 2022, mother testified that she visits the children three days per week, six hours per visit. Mother said the visits were "really good," and "I get to do a lot of things with the kids." Toward the end of the visits, "it depends on the mood. It's usually when they want to go home or they actually don't want to. They keep asking why they have to go back to my mom's house." Mother testified that the children are bonded to her, and she had attempted to attend some medical appointments, but during the Covid-19 pandemic additional people were not allowed at visits. Mother said she wanted to be more involved in the children's medical or dental care, but MGM "would shut me out." No additional evidence was submitted.

In argument, DCFS's counsel noted, "I assume mother will argue that the beneficial relationship exception should apply." DCFS's counsel stated that mother had not met the burden to support the exception. Counsel conceded that mother met the first prong—regular contact with the children—but asserted that mother had not shown a beneficial relationship that would outweigh the benefits of permanency for the children.

Counsel for the children joined in DCFS's argument, and also asserted the parental benefit exception did not apply to

12

father, who had not visited the children for four months. The children's counsel agreed that mother had not submitted any evidence to show that terminating parental rights would be detrimental to the children.

Mother's counsel asked the court "to find that the child-parent bond exists, and order that the permanent plan be legal guardianship instead of the termination of parental rights and adoption." She noted that the children are happy to see mother and cry when she leaves. She further asserted that the children have a "significant and positive attachment" to mother. Father's counsel stated only, "I join with mother's counsel. I would ask the court to order a plan of legal guardianship. Submitted."

The court asked the children's counsel whether legal guardianship would be a better option, "if we assume that terminating mother's parental rights may in some ways discourage continued contact." The children's counsel responded that the children are young, three and five years old, and "[i]t's always best to go with a permanent plan, which is adoption." The children's counsel also noted that none of the evidence suggested the relationship between mother and the children would change, "quite the contrary. . . . [MGM] is more than willing to facilitate contact with mother." He also stated that there was no benefit to guardianship over adoption. "The only benefit with legal guardianship would be to open the door for mother to file a [section] 388 [petition]. But . . . she's had ample time to do everything she needs to do" to reunify with the children. The children's counsel further noted that the children were well-bonded to MGM. Counsel for DCFS joined the children's arguments "in their entirety."

13

The court took the matter under submission, and ordered the parties to return on January 18, 2022. The Court of Appeal ordered a stay upon mother's request, so the hearing was continued to March 10, 2022. The stay was lifted on February 17, 2022 after mother did not file a writ petition.

A last-minute information filed February 16, 2022 stated that MGM remained adoption-ready, and adoption continued to be the permanent plan for the children. A status review report filed the same day stated that J. was doing well in school, he had "a strong connection to MGM," and he "enjoys having visits with mother and father." N. was having some behavior issues and had started attending school from 11:45 a.m. to 3:30 p.m. five days per week. The report did not mention N.'s visits with mother or father. Overall, the children were "happy, active, playful children who are completely bonded with their caretaker. Likewise, [MGM] already see[s] and treat[s] [J.] and [N.] as her children." DCFS stated, "Adoption with [MGM] remains as the best and most appropriate permanent plan for" the children.

Mother continued visiting three days per week, four hours per visit. Mother would take the children to a park, eat dinner with them, and watch television with them. On October 21, 2021, a school night, mother brought the children home at 1:28 a.m. Father was visiting with the children on Saturdays and Sundays, monitored by other family members after father threatened MGM.

Father filed a section 388 petition seeking to change the court's order terminating reunification services, stating that he was enrolled in various programs that were ordered during the reunification period.

At the hearing on March 10, 2022, the court noted father's section 388 petition, and allowed father to make an offer or proof. Father's counsel argued that father's participation in services constituted a change in circumstances, and father's visits with the children have been "high quality." The court asked the children's counsel for his position on father's petition, noting that typically at a section 366.26 hearing, "the court does not look at a parent's progress at this stage." The children's counsel argued that the petition should be denied, noting that father was requesting additional reunification services 30 months into the case.

Counsel for DCFS objected to the petition as untimely, given that the court already had the section 366.26 hearing and the parties were returning only for the court's ruling. DCFS also argued that father made no showing that the change would be in the children's best interests. The court denied father's section 388 petition "for procedural reasons, given that I have heard the [366.26] previously," and "also because the court finds it is not in the best interests of the children."

Turning to the section 366.26 ruling, the court stated that it had reviewed the case record, and the parents were never able to resolve their issues. The court stated, "I do believe that California law requires me to terminate parental rights today. I don't find that an exception applies." The court found the children were adoptable; it had "considered the various parental exceptions and find they are not applicable." The court found it would be detrimental to return the children to the parents, and "no other exception to adoption applies in this case." The court therefore terminated mother's and father's parental rights, and designated MGM as the prospective adoptive parent. The court

15

acknowledged to the parents, "I know that this decision is not one that you wanted to hear. . . . I also want you to understand that this process is also traumatic for the children, and there has to be an end to it. They do deserve permanency and so that is why the law does balance those interests."

When the court asked if the parties had anything else to add, mother's counsel said, "Mother objects to the termination of her parental rights. She requests a stay. She also wants to know [*sic*] the maternal grandmother says she preferred legal guardianship over adoption." The court moved on to father's counsel, who stated that father objected "to the termination of parental rights on the basis that there is, first of all, prima facie evidence for our 388, as well as on the grounds of a parent/child bond." The court stated, "[L]et the record be clear that I did consider that parental benefit exception and found that it does not apply on the various prongs that are laid out. The parents haven't played a sufficient parental role and they do not meet the standard laid out in the cases on the parental benefit exception."

Mother and father timely appealed the termination of parental rights.

## DISCUSSION

Mother and father both contend the juvenile court erred in finding that the beneficial relationship exception did not apply to their relationship with the children. DCFS asserts that mother has not shown that the beneficial relationship exception applies to her, and no one below contended the beneficial relationship exception should apply to father.

A.    **Legal principles**

Children have "compelling rights . . . to have a placement that is stable, permanent, and that which allows the caretaker to

16

make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time." (*Id.* at p. 307.) "[W]here possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker." [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).)

Thus, at a section 366.26 hearing, the court is required to terminate parental rights and order the child placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R., supra*, 31 Cal.4th at p. 53.) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ((§ 366.26, subd. (c)(1)(B)(i).) "[T]he exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)

17

There are "three elements the parent must prove to establish the [parental-benefit] exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) In other words, "the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Id.* at pp. 636-637.)

We review the court's determination on the first two elements for substantial evidence; the third element "is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) However, where, as here, a parent contends the court erred in finding she did not meet her burden of proof, we must determine whether "the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a

judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4, 1010, fn. 7.)

We consider the three elements below, addressing mother's contentions first.

**B.    Mother's appeal**

Mother argues the juvenile court erred by finding that she failed to meet her burden regarding the *Caden C.* elements.  She also contends the juvenile court relied on improper factors when it stated that mother did not take a parental role with the children, and by suggesting that mother's relationship with the children likely would not be completely severed.  DCFS asserts that the court's rulings were correct, and that mother forfeited any contention that the court relied on improper factors by failing to assert any specific objections below.  We find no error.

1.    *Regular visitation and contact*

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)  This element is not in dispute with respect to mother.  By all accounts, mother maintained regular and consistent visitation with the children throughout the pendency of the case.

2.    *A relationship, the continuation of which would benefit the children*

The second element considers "whether 'the child would benefit from continuing the relationship'" with the parent. (*Caden C., supra*, 11 Cal.5th at p. 632, quoting § 366.26, subd. (c)(1)(B)(i).)  A beneficial relationship is one that "promotes the

well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Thus, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) The focus is on the child, and the relationship may be shaped by "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.)

Mother has not demonstrated that the court was compelled to find in her favor on this element. N. was about seven months old when the case began in June 2019, about eight months old when she was detained from parents in August 2019, and three years old at the time of the section 366.26 hearing in March 2022. J. was two years old when the case began, nearly three years old at the time of detention, and five and a half at the time of the section 366.26 hearing. Thus, N. had spent only eight months of her life in mother's care, and J. had spent about his first three years in mother's care. The children had been in MGM's care continuously for about two and a half years.

Mother spent several hours each week with the children. Mother points out that she fed the children, played with them, and they sometimes cried at the end of their visits. However, "the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318.) "A positive attachment between

parent and child . . . is nurturing and provides the child with a sense of security and stability. . . . [A]n emotional attachment is one where the child views the parent as more than a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached, or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)  Here, although mother's visits with the children were consistent and pleasant, there was no evidence that the children derived a sense of security from those visits, or that the children saw mother as more than a trusted friend.

Mother argues DCFS "was derelict in not gathering" more information about how the children felt about visiting with her, stating that J. was not "interviewed in any depth about his feelings about" mother, and N., age three, was "certainly old enough to have been questioned."  However, the burden of proving the parental-benefit exception fell on mother—not DCFS. (See *Caden C. supra*, 11 Cal.5th at p. 636 ["the parent asserting the parental benefit exception must show, by a preponderance of the evidence," the three elements].)

Mother focuses on some of her own actions, such as her attendance at the children's medical appointments or J.'s therapy sessions, as proof that her visits were beneficial to the children. But this was only true in the first part of the case.  Toward the end of the case, J. was no longer receiving therapy, and mother testified that although she wanted to be more involved with the children's medical care, MGM "would shut me out."  Mother also does not suggest how her involvement in the children's medical care—as opposed to MGM's involvement alone, which was by all accounts entirely effective—benefited the children.

21

Mother further contends the court erred in stating that the parents had not "played a sufficient parental role."[4]  We find no error.  Many cases before *Caden C.* held that it was appropriate to consider whether parents play a "parental role" when determining the parental benefit exception, distinguishing the parent's role in the children's life from that of a friend or non-parent family member. In *In re C.F.* (2011) 193 Cal.App.4th 549, 555, for example, the court stated, "A parent must show more than frequent and loving contact or pleasant visits. . . .  The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." Similar language has been used in many cases addressing the parental-benefit exception.  (See, e.g., *In re K.P.* (2012) 203 Cal.App.4th 614, 621 ["No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life'"]; *In re A.G.* (2020) 58 Cal.App.5th 973, 995; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1234; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)

---

[4]     DCFS contends mother has forfeited this argument, because she did not object to the court's statement below.  Mother asserts that because she raised the parental-benefit objection below, all objections involving any "legal standard" have been preserved.  DCFS is correct that in order to preserve issues for review, an objection must be specific and "state the ground or grounds upon which the objection is based."  (*In re E.A.* (2012) 209 Cal.App.4th 787, 790; see also *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [parties should "bring errors to the attention of the trial court, so that they may be corrected"].)  We nevertheless exercise our discretion to address mother's contention.

22

*Caden C.* did not discuss a "parental role," but it also did not disapprove cases that used the phrase. As our colleagues in the Fourth District, Division Two, have noted, "[T]he words 'parental role,' standing alone, can have several different meanings," and because of this ambiguity, it may be "better not to use the words 'parental role' at all." (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210, 211; see also *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319 ["problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it"].) Even so, in order for the parental-benefit exception to apply, "the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly non-parent relative, such as an aunt" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468), keeping in mind that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C., supra*, 11 Cal.5th at p. 632.) Here, nothing in the record suggests the court relied so heavily on an inappropriate definition of a "parental role" that it failed to appropriately consider the *Caden C.* elements. To the contrary, when the court made the "parental role" statement, it said in the same sentence that the parental-benefit exception elements had not been met.

In short, substantial evidence supports the court's finding that although mother's visits with the children were pleasant and enjoyable, mother did not establish a benefit from continuing the relationship. Mother has not demonstrated that the court was compelled by law to find in her favor on this element. Even assuming this element had been met, however, the court's ruling as to the third and final element was not an abuse of discretion.

23

3. *Whether termination of parental rights would be detrimental to the children*

For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra*, 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.)

Mother asserts this element was also met, pointing to only two pieces of evidence: her "interactions with the children were observed to be uniformly positive," and J.'s questions to MGM about whether he would be returned to mother's home. This evidence is not sufficient to demonstrate an abuse of discretion. Regarding her visits with the children, "pleasant and cordial [parental] visits are, by themselves, insufficient to mandate a permanent plan other than adoption." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924.) Notably, mother points to no other evidence suggesting that terminating her relationship with N. would be detrimental to N.

Regarding J. asking about living with mother, mother contends that J., "more than two-and-a-half years after being detained, continued to ask why he was not going home to mother, and continued to cry for mother, 'questioning his life and environment.'" This does not accurately reflect the evidence. MGM reported that *after* J. turned five—more than two years after detention, and after he had started kindergarten—he began asking why he did not live with mother. In response, MGM repeatedly told J. that he would be going to live with mother "soon," because she did not know what else to say.

24

This evidence does not favor finding that termination of mother's rights would be detrimental to the children. To the contrary, it highlights the importance of permanency and stability in a child's life. It is not surprising that J. was "questioning life and his environment" after being told multiple times that his home with MGM was not permanent and would soon change. The relevant question for the court is "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.) The evidence does not show that the benefit of continuing J.'s pleasant relationship with mother outweighed his expressed need for a stable, permanent home. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["if mother's parental rights were *not* terminated, the [children] would be denied a permanent, stable adoptive family, [which is by statute] more desirable than legal guardianship"].)

Mother argues the court erred by making an "assumption that the children's relationship with mother would continue after termination of parental rights." She points to the section 366.26 hearing, in which the court asked the children's counsel, "[I]f we assume that terminating mother's parental rights may in some ways discourage continued contact, why wouldn't legal guardianship be better for the children?" The children's counsel responded that it is "always best to go with the permanent plan, which is adoption," and added that because MGM and mother have an ongoing relationship, "I don't think that terminating parental rights will discourage communication with mom." Mother argues that from this exchange, "[t]he juvenile court here seems to have been misled into believing that it could terminate

parental rights with the assurance that maternal grandmother would allow mother ongoing visits."[5]

This conclusion is not supported by the record. The court correctly acknowledged that adoption, rather than legal guardianship, requires a court to consider that the parental relationship may be severed completely. (See *Caden C., supra*, 11 Cal.5th at p. 633 ["Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship"].) Nothing in the record suggests the court was misled or changed its position due to counsel's suggestion that visitation might continue even if the court terminated mother's parental rights.

In short, mother has not demonstrated that the juvenile court abused its discretion in finding that the parental-benefit exception did not apply. We therefore turn to father's appeal.

## C.    Father's appeal

Father argues that he also met the three *Caden C.* elements, and therefore the parental-benefit exception applies to him as well. DCFS correctly points out that father never suggested in the juvenile court that he was entitled to the parental-benefit exception, and he presented no evidence on the issue. The sole issue father asserted at the January 11, 2022 hearing involved his section 388 petition seeking to reinstate reunification services, which the court denied. During the portion of the same hearing addressing the section 366.26 issues, after mother testified and her counsel argued that the parental-benefit exception applied to mother, father's counsel stated, in

---

[5]     DCFS correctly points out that neither mother's nor father's counsel objected to any part of this exchange.

26

full, "Your honor, I join with mother's counsel. I would ask the court to order a plan of legal guardianship. Submitted." When the parties returned on March 10, 2022 for the court's ruling, after the court stated its ruling terminating parental rights, father's counsel objected "to the termination of parental rights on the basis that there is . . . prima facie evidence for our 388, as well as on the grounds of a parent/child bond."

Thus, father presented no evidence or argument suggesting to the juvenile court that he was asserting that the parental-benefit exception applied to him. The issue has therefore been forfeited. (See, e.g. *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [a reviewing court ordinarily will not consider an issue not raised below]; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 [forfeiture "applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings"].)

Even if we were to consider the merits of father's contention on appeal, however, he has not demonstrated error. He does not meet the first *Caden C.* element: he did not maintain consistent visitation with the children. Father argues in his appellate brief that he "maintained consistent visitation with [the children] throughout the two-and-a-half-years of dependency proceedings." However, father did not visit the children for months when the case began, father admits he missed five visits in January 2021, and the December 17, 2021 section 366.26 report stated that father had not visited the children for four months. Missing visits for months at a time, when the court allowed three visits per week, does not constitute "regular visitation and contact."

27

The record also does not support a finding that father met the second element: "a *relationship*, the continuation of which would *benefit* the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) Father contends he met this element because the "interactions between the minors and father were positive and . . . the visits went well." As discussed above, however, a parent must show more than pleasant visits with the children to satisfy the second element of the *Caden C.* analysis.

Father does not point to any evidence supporting the third *Caden C.* element, whether termination of parental rights would be detrimental to the children. Instead, he argues the juvenile court "relied on impermissible factors, such as whether the parents had resolved the problems that led to the minors' dependency and whether the parents occupied a parental role in the children's lives." Father argues that remand is required so the court can follow *Caden C.* more closely.

We disagree. Although the juvenile court did not expressly discuss each of the three *Caden C.* elements, it did state that the elements had not been met. Moreover, the court's references to what father contends are "impermissible factors" do not demonstrate error. For example, father argues the court "focused on the parents' lack of progress in addressing the reasons that the minors were detained," but in the portion of the reporter's transcript father cites, the court was stating its reasons for denying father's section 388 petition. Father argues the court impermissibly considered "whether the parents had resolved the problems that led to the minors' dependency," but on the cited page the court was simply making a statement that continued jurisdiction under section 300 was necessary—it was not stating its reasons for terminating parental rights. We also find no error

28

in the court's comment about the "parental role," as we discussed in relation to mother's appeal above. And because father has cited no evidence that could support a different conclusion as to the third *Caden C.* element, he has not demonstrated the juvenile court abused its discretion.

In short, even if he had not forfeited his claim to the parental-benefit exception, father has not demonstrated reversible error.

## DISPOSITION

The juvenile court's March 10, 2022 order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



CURREY, ACTING, P.J.



STONE, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.